Anthony Carabba, Jr. (AC 1487)
Jeffrey Schulman (JS 0702)
Carabba Locke LLP
100 William Street
New York, New York 10038
(212) 430-6400

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
CHRISTINE SMITH,

                    Plaintiff,

   -against-

TISHMAN CONSTRUCTION CORPORATION
OF NEW YORK, TISHMAN CONSTRUCTION
CORPORATION, DANIEL R. TISHMAN, and
JOHN LIVINGSTON,

                    Defendants.
------------------------------------------------------------X


FEB 22 2008
U.S.D.C. S.D. N.Y.
CASHIERS

ECF Case

**08 CV 1816**

Civil Action No._____

**COMPLAINT**

**JURY TRIAL DEMANDED**

JUDGE BAER

Plaintiff CHRISTINE SMITH, by and through her attorneys, Carabba Locke LLP, alleges and complains as follows:

## INTRODUCTION

1.    Plaintiff brings this gender discrimination lawsuit against her former employer pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), the Equal Pay Act, 29 U.S.C. § 206(d) (the "Equal Pay Act"), the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* (the "Human Rights Law"), the New York City Administrative Code § 8-101, *et seq.* (the "City Law"), the New York State Labor Law, N.Y. Lab. L. § 194 (the "Labor Law") and for retaliation for opposing discrimination and asserting rights under Title VII, the Human Rights Law and the City Law.

2. Plaintiff seeks compensatory and punitive damages, liquidated damages, emotional distress damages, attorneys' fees, and other appropriate relief under Title VII, the Equal Pay Act, the Human Rights Law, the City Law and the Labor Law.

## THE PARTIES

3. Plaintiff Christine Smith ("Plaintiff"), a female, is a resident of Nassau County, New York and is a citizen of the United States.

4. Upon information and belief, Defendant Tishman Construction Corporation of New York ("Tishman" or the "Company") is a corporation organized and existing under the laws of the State of Delaware and is authorized to do business in the State of New York. Upon information and belief, Tishman maintains its corporate offices at 666 Fifth Avenue, New York, New York.

5. Upon information and belief, Defendant Tishman Construction Corporation ("TCC") is a corporation organized and existing under the laws of the State of Delaware and is authorized to, and does, do business in the State of New York. Upon information and belief, TCC is Tishman's parent company.

6. Upon information and belief, Defendant Daniel R. Tishman is a resident of Westchester County, New York and is an officer of both Tishman and TCC.

7. Upon information and belief, Defendant John Livingston ("Livingston") is a resident of New York County, New York and is an officer of both Tishman and TCC.

8. At all times relevant to the Complaint, Defendants Tishman and TCC were employers within the meaning of Human Rights Law § 292(5) and City Law § 8-102(5).

## JURISDICTION AND VENUE

9. This court has jurisdiction over this action pursuant to 42 U.S.C. § 2000e-5, 29 U.S.C. § 216(b) and 28 U.S.C. §§ 1331, 1343. This court may assert supplemental jurisdiction over the state law claims as authorized by 28 U.S.C. § 1367(a).

10. Venue properly lies within this judicial district as Tishman's corporate office is within this judicial district and because a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district.

11. Plaintiff has fulfilled her administrative prerequisites prior to filing suit.

12. Prior to commencing this action, Plaintiff served a copy of this Complaint upon the New York City Commission on Human Rights and the Corporation Counsel for the City of New York.

## STATEMENT OF FACTS

13. Plaintiff began working for Tishman in December 1997 as Director of Human Resources ("HR"). She was promoted to Vice President of HR in December 2001. From the inception of her employment through about October 2006, her direct supervisor was Larry Schwarzwalder, the Treasurer of the Company, who in turn, reported to Daniel Tishman, the Company's Chairman and Chief Executive Officer.

14. The Company's management is almost exclusively male. As of approximately March 2007, the Company had 12 males and not a single female at the Executive Vice President level. At the Senior Vice President level, there were 16 males and just one female. At the First Vice President level, there were 7 males and just one female.

15. Throughout her employment, Plaintiff's job performance was excellent. Prior to her hire, the Company did not have a structured HR department -- the various HR functions were spread throughout several departments in a disorganized fashion. Upon Plaintiff's hire, she successfully created a centralized HR department and then oversaw the Company's HR functions, including from 2001 through 2005 when she was forced to work with a staff of just two due to budget cutbacks.

16. In Spring 2006, Schwarzwalder informed Plaintiff that the number of HR personnel reporting to her would be increased. He explained that the Company's goal in increasing the staffing level in the HR department was to allow Plaintiff to focus on the critical, "big picture" HR functions and be less involved in the day-to-day operations of the department. Indeed, in an e-mail dated June 15, 2006, Schwarzwalder stated that he was "thrilled" on being able to focus on Plaintiff in terms of her development and that he was looking forward to "developing a deeper and stronger organization beneath [Plaintiff]." According to Schwarzwalder, the HR hiring and expansion was designed to reward Plaintiff for her prior work performance and to provide her with even more responsibility. As a result, Plaintiff began delegating more of the day-to-day oversight of the HR department to Diane Morelli, the Director of the department.

17. Once it became known that Schwarzwalder gave Plaintiff additional decision-making authority, and a larger role within the management structure, she was made a target. On or about July 21, 2006, Mr. Schwarzwalder showed Plaintiff a copy of an email from Linda Christensen, Tishman's Senior Vice President and General Counsel, to John Livingston,

the President of the Company, in which Christensen accused the HR department generally, and Plaintiff in particular, of mishandling the termination of a Tishman employee.

18.     Plaintiff knew that the allegations against her were false and that this was an effort by Livingston to discredit her and force her out of the Company. On or about July 26, 2006, Schwarzwalder sent an email to Livingston and Christensen stating that the email was "untrue, unsubstantiated, and focused on destroying the credibility of Christine Smith and the HR Department." He explained that he personally investigated the contents of the email and was "appalled at the inaccuracies and accusations directed at both Christine Smith and the HR Department."

19.     Approximately one month later, Schwarzwalder informed Plaintiff that those above him decided to hire an HR executive, to whom she would report, who would "oversee" the HR department. Frank Beck, the Company's Chief Financial Officer, informed Plaintiff that the new position would be called "Chief HR Officer" and that it would be solely devoted to strategic planning without involvement in the day-to-day operations of the HR Department. Plaintiff was also informed that she would not be involved in hiring process for the new position but that two "recruiting associates" -- individuals who are far below her in the Company hierarchy -- would be searching for and screening the candidates.

20.     In an advertisement seeking candidates for the newly created position, the duties included virtually all of Plaintiff's job functions and, indeed, was patterned after a written description of her own job duties and responsibilities. In an effort to humiliate Plaintiff, the Company posted an advertisement for the position, containing the Company's name, with the Society for Human Resources Management, where Plaintiff had been a member for many

years. As a result, Plaintiff received several embarrassing phone calls from her fellow Society members and others, asking if she had been terminated. Her fellow members believed, based on the advertisement, that the Company was seeking someone for Plaintiff's exact position.

21.   As a result of these developments, Plaintiff became concerned for her job security and met with Mr. Schwarzwalder and Mr. Beck to discuss the issue. Beck claimed that Plaintiff was not being demoted and that she would still have "plenty to do."

22.   During this time, Plaintiff believed that the Company's actions were based on her gender. The decision-makers at Tishman (including Daniel Tishman and John Livingston) constitute the classic "old boy network," and Plaintiff, of course, was not a member. On September 15, 2006, an incident occurred to reinforce Plaintiff's belief. On that date, she attended a meeting with Livingston, Christensen, Amy Cordone and Alicia Shawlinski. When the meeting commenced, Livingston stated bluntly, "we have too many women around here." Plaintiff was shocked. Remarkably, Christensen responded, "I just fixed that, I hired a male attorney." What is telling is that the Company's male dominated culture forced a female (the Company's General Counsel) to support Livingston's biased comments, rather than objecting to them or disavowing them in some way.

***The Company Hires a Male, At a Significantly Higher Salary, To Perform Plaintiff's Duties***

23.   In early October 2006, the Company hired a male to fill the newly created position of Chief HR Officer. Upon information and belief, Defendants Daniel Tishman and John Livingston were the individuals who decided to hire the male as the new Chief HR Officer. Although the role was highly similar to the functions that Plaintiff had been performing, Plaintiff learned that the newly-hired male's salary would be nearly twice

6

Plaintiff's. At that time, Plaintiff was told to vacate her office so that it could be given to the new hire (Plaintiff had occupied that office for approximately eight years) and that she would be moved to an interior, windowless office.

24. Plaintiff immediately became suspicious that the new hire was not given an office on the "executive" floor, a location that presumably would be more suitable in light of his purported "management" role and his non-involvement in the day-to-day operations of the HR Department. When Plaintiff complained about this issue, the only response that she initially received, from Beck, was that the new hire "has to be part of the team."

25. Contrary to Tishman's prior claims, the new hire was not focused on the strategic planning issues, but essentially assumed Plaintiff's job duties (albeit at a much higher wage) and began micromanaging Plaintiff and the rest of the HR staff, all in a transparent effort to force Plaintiff to leave.

***Plaintiff Is Paid Less Than Similarly-Situated Male Employees***

26. For years, Plaintiff has been paid significantly less than a comparably situated male. Specifically, the male Vice President of HR in the Company's hotel division (the same position that Plaintiff occupies but in the construction division) whose wages are set by the same corporate management, had consistently received wages that are approximately ***40% higher*** than Plaintiff's. This pay disparity existed for approximately eight years despite that unlike Plaintiff, the male in question did not supervise a staff of employees. Moreover, he had less responsibility than Plaintiff, had been given lower performance standards, and frequently called Plaintiff (and her HR staff) for advice and direction. Plaintiff raised this discriminatory pay disparity with Mr. Schwarzwalder on numerous occasions, to no avail.

*The Company Tolerates Discrimination Against Other Female Employees*

27.  In or about January 2006, a significant sexual harassment issue arose at the Company. At that time a high level male executive was found to be engaging in a sexual relationship with a female subordinate, who later complained of retaliation. The Company flatly refused to terminate the executive, likely because he was a friend of the Company's Chief Operating Officer (or, in other words, because he was part of the aforementioned "old boy network"). By not terminating the harasser, the Company again sent a clear message about the role of women in the Company and its view of the laws designed to protect women in the workplace.

*The Company Retaliates Against Plaintiff*

28.  After Plaintiff complained of discrimination and filed her initial EEOC Charge of Discrimination on or about January 30, 2007, Tishman continued to discriminate against her on the basis of her gender and has retaliated against her for filing the Charge.

29.  On or about February 6, 2007, Schwarzwalder informed Plaintiff that Tishman management felt that her employment "was just not working out." He offered Plaintiff six months severance pay in exchange for her resignation. Plaintiff told him that she would not resign and that she was shocked that the Company would try to force her out just days after she filed her Charge.

30.  On or about February 12, 2007, Matthew Stolper, the newly hired "Chief HR Officer" publicly embarrassed Plaintiff during a staff meeting. During the meeting, Stolper asked the staff for comments concerning his proposed restructuring of the HR department. Diane Morelli expressed her views about the restructuring. In response, Stolper berated and

belittled Ms. Morelli and told her to leave the meeting if she wished to. Plaintiff felt terrible that Ms. Morelli was subjected to Stolper's tirade, especially because she knew he would not have acted in that manner against a male employee. Stolper then turned his anger to Plaintiff and said "if you do not like what is being said you can leave the meeting as well." Plaintiff responded by saying "I just feel sorry for the staff." Stolper then raised his voice and told Plaintiff "you should feel sorry for yourself, and again, if you do not like how I am conducting this meeting, leave." Plaintiff replied that it was inappropriate for him to speak to her in that manner in a public forum and left the meeting. After the meeting, most of the members of the HR department told Plaintiff that they were very upset by Stolper's harassing conduct against her and Morelli during the meeting.

31.  Shortly after this meeting, Morelli abruptly resigned from Tishman, largely due to Stolper's discriminatory behavior. A male was hired to replace Ms. Morelli as the Director of HR.

32.  On March 2, 2007, in a blatant act of retaliation, Plaintiff was called into a meeting with Stolper and Judy Herman, one of Tishman's in-house attorneys. Stolper presented Plaintiff with a written warning to document her allegedly "unsatisfactory job performance." This was the first warning Plaintiff had received as a Tishman employee. After reading it, Plaintiff told both Stolper and Herman that she was "shocked" because the warning was completely false. Plaintiff then refuted each of the allegations in the letter. At one point during the meeting, Stolper stated that Plaintiff had problems getting along with Tishman employees. Plaintiff thought that this was ridiculous and asked Ms. Herman if during her several years with the Company she had ever heard that Plaintiff had problems getting

along with anyone and if so, why it had never been addressed in the past. Ms. Herman could offer no response.

33.  The written warning, concluding with a threat of "serious disciplinary action up to and including termination," was completely false and constituted an act of retaliation for Plaintiff's complaints of discrimination and her filing of an EEOC Charge.

34.  In addition to the retaliatory written warning, after the filing of her initial Charge, Tishman also retaliated against Plaintiff by stripping her of virtually all of her duties as Vice President of Human Resources. Instead, she was given Morelli's job responsibilities, which were mainly clerical and administrative, and were comprised largely of completing benefits paperwork.

35.  In addition, on March 7, 2007, Stolper sent an email to all Hiring Managers and Hiring Assistants (and copied the entire HR department and various executives) stating that "all HR authorizations, sign-offs, etc. (signature or otherwise) previously required of [Plaintiff] – must come from me." Stolper did not provide Plaintiff with any advance notice of this email or that he would be stripping her of her duties. Plaintiff was extremely upset and humiliated -- both because the email stripped her of the authority she had before she complained and because it was distributed throughout the Company.

36.  The Company has also retaliated against Plaintiff by ostracizing her from her co-workers and brandishing her as an outcast. Specifically, the Company informed other employees -- including Plaintiff's subordinates -- that she commenced legal proceedings. On or about March 8, 2007, Stephanie Delacruz, the Benefits Coordinator, told Plaintiff that she

knew of her "lawsuit" against the Company and that Livingston was "mad at [her] about it." Plaintiff was shocked and told her that she could not discuss it.

37. In yet another act of retaliation, the Company refused to send Plaintiff to a Merrill Lynch Client Conference in Arizona, which she had attended every year for the previous seven years (it is an annual conference for pension and 401(k) plan sponsors). Since Plaintiff was the plan administrator for Tishman's plans with Merrill Lynch, the conference was ideally suited for her. Stolper told Plaintiff that she could not attend the conference because "we need to concentrate on being in the office for our customers" despite that Plaintiff would have only been out of the office for three days if she had attended. Tishman never objected to Plaintiff attending this conference for seven consecutive years -- it only became a "problem" after she filed her Charge with the EEOC.

38. Tishman's most shocking and humiliating act of retaliation against Plaintiff was its demand, as set forth in the written warning, that Plaintiff inform Stolper every time she left her work area "for more than a few minutes." The Company asked Plaintiff to do this despite her explanation to Stolper and Herman that many absences from her desk are because she was working with and assisting other Tishman employees. The fact that she was asked to inform Stolper every time she left her work area was demeaning and embarrassing, particularly given her position as a Vice President of the Company. She was aware of no other employee who was asked to notify their supervisor every time they were to leave their desk for more than a "few minutes."

***The Retaliation Continues and Plaintiff is Constructively Discharged from Her Employment With Tishman***

39. On or about June 22, 2007, Stolper falsely accused Plaintiff of going over his head by recommending a policy change to Schwarzwalder. Schwarzwalder confirmed that Stolper's accusation was untrue and an overreaction.

40. As a further act of retaliation, Stolper began forcing Plaintiff to have her work approved by her subordinates. For example, in an email dated July 10, 2007, Stolper requested that Plaintiff have an Affirmative Action Report "reviewed thoroughly" by her subordinates, despite that she had successfully completed Affirmative Action Reports for many years without any assistance.

41. Further, Tishman ostracized Plaintiff from her co-workers by giving her the "option" to attend a national HR meeting, despite that it was mandatory for all of Tishman's other HR employees to attend the meeting. When Stolper told Plaintiff that she had the "option" to attend, it was clear from his tone that she was not welcome at the meeting.

42. Plaintiff began seeing a mental health professional in or about February 2007 as a result of the stress that the discriminatory work environment was placing on her. In the ensuing month's, as Tishman continued to retaliate against her, Plaintiff's emotional distress increased. Plaintiff was diagnosed with Adjustment Disorder and Anxiety. In or about May 2007, Plaintiff began experiencing physical symptoms related to the stress that she was suffering, including but not limited to gastrointestinal problems. Plaintiff sought treatment from a Gastroenterologist, who could not find any physical cause of Plaintiff's symptoms. On or about August 3, 2007 Plaintiff was placed on short-term disability and commenced an approved leave of absence due to her medical condition. Plaintiff's physical symptoms

temporarily improved, but worsened again as her scheduled date to return to Tishman approached.

43. Plaintiff's doctors advised her to resign from Tishman so that she would no longer have to endure the humiliating and hostile work environment. Plaintiff resigned her employment with Tishman on or about September 4, 2007, prior to her scheduled return from her leave of absence.

44. Plaintiff's resignation constitutes a constructive termination of her employment. Plaintiff was constructively discharged by the acts of her superiors at Tishman, including but not limited to, Defendants Daniel Tishman and John Livingston.

## FIRST CAUSE OF ACTION

### Sex Discrimination

45. Plaintiff realleges and incorporates by reference paragraphs 1 through 44 of the Complaint as if fully set forth herein.

46. By the aforementioned actions, Defendants, separately and together, have discriminated against Plaintiff in the terms, conditions, and privileges of her employment, on the basis of her sex, in violation of Title VII, the Human Rights Law and the City Law.

47. As a result of the discrimination engaged in by Defendants, Plaintiff has suffered severe damage, including deprivation of income and benefits, termination of employment, loss of opportunity for advancement and promotion, emotional pain and suffering, mental anguish, humiliation and damage to reputation and career.

## SECOND CAUSE OF ACTION

### Retaliation

48. Plaintiff realleges and incorporates by reference paragraphs 1 through 47 of the Complaint as if fully set forth herein.

49. Defendants, separately and together, have discriminated against Plaintiff in retaliation for, and on account of, her opposing discrimination and asserting her rights under the anti-discrimination laws with respect to compensation, terms, conditions and privileges of employment in violation of Title VII, the Human Rights Law and the City Law.

50. As a result of Defendants' retaliation against her, Plaintiff has suffered severe damage, including deprivation of income and benefits, termination of employment, loss of opportunity for advancement and promotion, emotional pain and suffering, mental anguish, humiliation and damage to reputation and career.

## THIRD CAUSE OF ACTION

### Aiding and Abetting Sex Discrimination and Retaliation

51. Plaintiff realleges and incorporates by reference paragraphs 1 through 50 of the Complaint as if fully set forth herein.

52. By the aforementioned actions, Defendants, separately and together, have aided and abetted sex discrimination and retaliation, in violation of Title VII, the Human Rights Law and the City Law.

53. As a result of the aiding and abetting engaged in by Defendants, Plaintiff has suffered severe damage, including deprivation of income and benefits, termination of

employment, loss of opportunity for advancement and promotion, emotional pain and suffering, mental anguish, humiliation and damage to reputation and career.

## FOURTH CAUSE OF ACTION

### Equal Pay Act and Labor Law

54. Plaintiff realleges and incorporates by reference paragraphs 1 through 53 of the Complaint as if fully set forth herein.

55. By the aforementioned actions, Defendants, separately and together have willfully and unlawfully violated Plaintiff's rights under the Equal Pay Act and the Labor Law, by paying her less than comparable males.

56. As a result of Defendants' violation of the Equal Pay Act and the Labor Law, Plaintiff has suffered severe damage, including deprivation of income and benefits, emotional pain and suffering, mental anguish, humiliation and damage to reputation and career.

## FIFTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress

57. Plaintiff realleges and incorporates by reference paragraphs 1 through 56 of the Complaint as if fully set forth herein.

58. By Defendants' extreme and outrageous conduct, Defendants, separately and together, intended to cause and did cause severe emotional distress to Plaintiff.

59. Plaintiff has suffered, and continues to suffer, severe emotional harm, loss, injury, and damage as a result of Defendants' conduct.

**WHEREFORE,** Plaintiff demands that judgment be entered in her favor and that the Court order and award her the following relief against Defendants:

A. Damages in the form of (i) back pay with interest based on Plaintiff's appropriate compensation had she not been discriminated against; and (ii) front pay.

B. Compensatory damages for her emotional pain and suffering, mental anguish, distress, humiliation, and loss of reputation in an amount to be determined at trial;

C. Punitive damages in an amount to be determined at trial;

D. With respect to the Equal Pay Act and Labor Law claims, compensatory and liquidated damages in an amount to be determined at trail;

E. Attorneys' fees;

F. Costs and disbursements;

G. Interest; and

H. Such other and further relief as this Court may deem just and proper.

### DEMAND FOR A JURY TRIAL

Plaintiffs demand a trial by jury as to all issues in the above matter.

Dated: New York, New York
February 22, 2008

CARABBA LOCKE LLP

By: _____
Anthony Carabba, Jr. (AC 1487)
Jeffrey Schulman (JS 0702)

100 William Street
New York, New York 10038
(212) 430-6400

*Attorneys for Plaintiff*